UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
WESTERN DIVISION

Jason L. Permenter,

    Plaintiff,

v.

Nancy A. Berryhill, Acting
Commissioner of Social Security,[1]

    Defendant.

No. 17 CV 50008

Magistrate Judge Iain D. Johnston

## MEMORANDUM OPINION AND ORDER

Plaintiff, who is now 45 years old, worked in the auto repair field until December 2004 when he stopped working because of leg and back pain. In 2007, he filed the first of several disability applications. Over the next nine years, his quest for disability benefits proceeded through a lengthy administrative process. Along the way, there have been four administrative hearings, three administrative decisions, and one appeal to this Court. However, in the fall of 2016, plaintiff finally achieved some degree of success when the administrative law judge ("ALJ") ruled that plaintiff was disabled as of November 9, 2015. Plaintiff has filed this appeal because he believes that he should have been found disabled five and a half years earlier, on March 31, 2010, which was his date last insured.

Plaintiff raises one argument for remand. He asserts that the ALJ failed to adequately account for moderate problems in concentration, persistence, and pace, caused by plaintiff's depression, when determining plaintiff's residual functional capacity ("RFC") and when posing hypothetical questions to the vocational expert. This argument is raised fairly often in disability cases, and is undoubtedly appealing to plaintiff's counsel because it rests on a narrow slice of the

---

[1] Nancy A. Berryhill has been substituted for Carolyn W. Colvin. Fed. R. Civ. P. 25(d).

1

record and is backed by a well-worn line of Seventh Circuit cases. However, as explained below, the simplicity and narrowness of this argument belies linguistic and conceptual pitfalls lurking underneath the surface.

## BACKGROUND

On May 7, 2013, an administrative hearing was held at which a medical expert (Gilberto Munoz) testified about plaintiff's back problems. Plaintiff also testified about his back problems, but also briefly discussed his obesity (he has weighed up to 410 pounds) and his depression. Plaintiff testified that his general physician, Dr. Woodman, first prescribed antidepressant medication in July 2009. R. 66. Plaintiff testified that his depression affected his self-esteem and made it hard to concentrate. When asked to give an example, plaintiff stated as follows:

> I love and am passionate for cars, and I have, like, tons of magazine subscriptions. But to get through an article, it's, like, impossible. I mean, I'll start reading it, and it's just, like—I can't focus on it anymore. It almost gets to the point where it's, like—it's blurry because I just can't focus or think and read what I'm trying to do.

R. 67.

On May 31, 2013, the ALJ issued a written decision finding plaintiff not disabled. The decision focused on plaintiff's back problems. However, at Step Three, the ALJ explained as follows why plaintiff's depression caused moderate limitations in concentration, persistence or pace:

> Although the claimant alleged having difficulty concentrating and memory problems because of his depression, he spends a significant amount of time of his day watching television, playing video games or using his computer (Ex. 3E/2). In addition, his doctors reported that the claimant understood their recommendations about treatment and his medical conditions.

R. 82. In the RFC formulation, the ALJ included a limitation that plaintiff could "understand, remember and carry out simple job instructions." R. 82. The ALJ noted that the State agency psychologist found there was "insufficient evidence" to even render an opinion about any alleged

mental impairment. R. 89. Despite this fact, the ALJ still included the above limitation because the State agency psychologist "did not have access to additional evidence or listen to the claimant's testimony." *Id.*

After exhausting his administrative remedies, plaintiff filed an appeal to this Court raising three arguments in his opening brief. (*Case No. 14-50241*.) The first one was essentially the same one he now raises—that the ALJ "failed to [] incorporat[e] Plaintiff's mental limitations in the hypothetical to the vocational expert." Dkt #10 at 6. Before any further briefing ensued, the parties agreed to a remand. This Court remanded without ruling on the merits. Dkt. #19 at 1.

On September 21, 2015, after receiving this Court's remand order, the Appeals Council issued its own remand order, which instructed the ALJ to "clearly identify the claimant's limitations in concentration, persistence, or pace with reference to the evidence of record and explain how the claimant's mental residual functional capacity accommodates for any concentration, persistence, or pace limitations with reference to the evidence of record." R. 650. The order also stated that any hypothetical questions to the vocational expert should include "specific/capacity limitations." *Id.* The order also included the observation that the ALJ's 2013 decision failed to "expressly explain" how plaintiff's concentration problems were accounted for. R. 649.

The ALJ held two new hearings. The first hearing, held on March 11, 2016, focused on the "mental health issues" because, as plaintiff's counsel noted, this is the subject they were "obligated" to address according to the remand order. R. 546. Counsel further noted that they were required to "delve into" the issue of how plaintiff's moderate limitations were accommodated by the RFC. R. 547. Next, the medical expert, psychologist Larry Kravitz, testified. He first summarized the evidence, noting that a consultative psychological evaluation in

3

January 2015 showed that plaintiff's mental status was "fairly intact with nothing of significance." R. 548; Ex. 4F.[2] It was also noted that plaintiff never sought any counseling at any time for his depression.[3] R. 552. Dr. Kravitz then gave the following assessment:

> So, Judge, there's not very much in the medical record. We have the consultative evaluation, but based on the fact that Claimant's been taking depressive medication for six years, based on his report that he continues to feel depressed most of the time and that he feels—at a minimum, he feels it exacerbates the limitations caused by the pain, I would, in terms of Part B limitations, I would give Claimant—I give him a mild restriction and maybe some mild restrictions in social functioning.
>
> But I would agree that he's got a moderate restriction in concentration, pace and persistence. And in terms of a residual functional capacity, he's mentally capable of understanding, remembering, carry[ing] out simple and detailed instructions. But I think persistence over extended periods of time is going to be limited. So I would overall restrict him to simple, repetitive tasks.

R. 555. This testimony, particularly the second paragraph, is a key piece of evidence relevant to plaintiff's current argument.

The ALJ then asked plaintiff about his back problems. Plaintiff testified that he just had surgery to alleviate the constant pain. The ALJ, after agreeing that plaintiff's back problems had worsened, suggested that plaintiff's case would be better "if he was seeking an onset date when he applied for supplemental security income on October 16th of 2014 rather than back on March 31st of 2010." R. 559. Plaintiff's counsel then reminded the ALJ of the Appeals Council's

---

[2] There was then a strange and troubling side discussion about alcohol use. The ALJ asked whether plaintiff considered himself an alcoholic; although plaintiff admitted drinking at times, he answered no to this question; and the ALJ agreed that he "[didn't] look like one." R. 551 ("Okay. So yes, it doesn't look like you're an alcoholic at all. I mean you don't look like one either. The people that are alcoholic carry the marks of the disease with them. I can tell if someone has that kind of problem. You don't have the stigmata of alcoholism about you."). This Court is unaware of a person's—even an ALJ's—ability to determine whether a person is an alcoholic by "look[ing] like one." The Court is also unfamiliar with the apparent aura of alcoholism. Perhaps a giant lighted arrow containing the word "alcoholic" appears above certain individuals, making them readily identifiable. Alas, the Court is unfamiliar with that phenomenon as well. The Court takes judicial notice that the ALJ has since retired. But the Court is concerned as to how many disability applicants were denied benefits as a result of this ALJ's belief in his power to identify alcoholics by looking at them and observing whether the claimant possessed the stigmata of alcoholism.
[3] He added that he could not afford treatment.

4

remand order. Set forth below is the colloquy that followed, which is quoted at some length because it addresses the same issue now before this Court:

> ALJ: I can give him SSI as of his application because the earlier point in time—so you'd get benefits for a couple years. I can do that for him.
>
> ATTY: And Judge, that's fine. *It doesn't answer the remand question though*, you know. I mean, Dr. Munoz back in May of 2013 when we were discussing the date last insured and the onset date, you know, he was placed with a sedentary RFC according to [] Dr. Munoz. And then like we've discussed, we've got the issue of the mental impairment as well.
>
> Judge, you know, we had a lot of testimony back in 2013 at the first testimony with Jason where I think he described a lot of the problems he was having with depression at that point. And that's why Your Honor found these problems in concentration, persistence and pace to a moderate level.
>
> And the records do document a diagnosis of depression earlier in 2009, a sleep with memory issues later in 2010. So there is—and like he's testified, he's been on Wellbutrin, you know, back in 2009 all the way to the present. So, you know, I think we've got mental limitations here that would, you know, make this RFC less than sedentary back around the date last insured.
>
> ALJ: Now if it's mental though and Dr. Kravitz had endorsed, you know, what the take on the case is. Jason's limited to unskilled work. That's for sure. But, you know, that's not going to qualify him for disability. See what I mean? So we've got someone back in 2010 who could do a range of sedentary type work limited to unskilled with simple tasks. Because of his age, that's not going to help him out.
>
> I mean honestly, and I agree with Dr. Kravitz. The mental health evidence here—you want to go back all the way to 2010—it's not overwhelming. It's not going to put him at a listing level. It'll eliminate the skilled [] jobs to be sure, but nothing beyond that. It's just not there.
>
> ATTY: Well, *there's also the issue of staying on task*, Judge. And I think that's one of the other things that came out in the testimony last time of, you know, what Jason testified to is he had issues with memory, *trouble focusing, difficulty concentrating*.
>
> Looking at my notes here from the last hearing, talked about having problems finishing a basic newspaper article he might be reading, called his memory atrocious. I mean, there was a lot of his testimony and evidence, which I think, you know, supports the fact that, you know, in addition to these physical problems, there's *a staying on task issue here as well*.

5

> ALJ: Dr. Kravitz said he'd stay on task as long as simple job instructions and, you know, really there's nothing extraordinary in the evidence that's going to say that he's incapable of persisting at a job as long as the instructions are simple. You know, if you do unskilled work, a person with, you know, an IQ of 70 or even 68 can do that.
>
> It doesn't take a lot of focus and concentration. It's just simple everyday jobs. And really there's nothing about Jason that's in [a] document or even the way he presents himself here that says he can't do that. Dr. Kravitz considered that. He put Jason at unskilled work. Okay. And that's just the reality. Honestly, we can keep on this, but there's nothing there [] to go beyond that. If we're missing something, I'm sorry.

R. 560-62 (emphasis added).

At the end of the hearing, the ALJ re-summarized Dr. Kravitz's earlier testimony in the following question and answer:

> Q So activities of daily living are mildly limited. Social abilities are mildly limited. Concentration, persistence and pace are moderately limited. Okay. And for a mental residual functional capacity, Mr. Permenter is able to understand, remember and carry out simple job instructions?
>
> A Correct.

R. 568. The ALJ replaced "tasks," the word Dr. Kravitz used, with "instructions," although neither Dr. Kravitz nor plaintiff's counsel noticed (or objected to) the switch.

The second hearing was held on July 20, 2016. Plaintiff answered a few questions about his depression, and talked about working part-time for a few months in 2014 as a babysitter for a five-year old boy who was best friends with plaintiff's son who was about the same age. R. 573-76. However, the bulk of the hearing consisted of testimony from Dr. Jilhewar about plaintiff's back problems. Then a vocational expert was asked hypothetical questions including a limitation that plaintiff was "able to understand, remember, and carry out simple job instructions." R. 620.

On September 22, 2016, the ALJ issued a 13-page decision. The ALJ stated the following about plaintiff's concentration:

6

> The claimant's mental impairments have posed moderate limitations on his ability to maintain concentration, persistence, or pace. The record reflects that the claimant reported good and bad days, feelings of being overwhelmed, and some memory deficits during the January 2015 consultative examination (Exhibit C4F). He said that he spent his days playing videogames, watching television, and using the computer. He was able to classify items, perform serial 7 testing, and perform arithmetic. The claimant recalled six digits forward and four backwards. He "appears intellectually capable but often fails to meet his potential" was the examiner's assessment (Exhibit C4F/3). The claimant was diagnosed with an unspecified depressive disorder. The claimant has not undergone any other mental status evaluation and none of his other doctors noted any concentration, persistence, or pace deficits. At the hearing in March 2016, Dr. Larry Kravitz testified that it was his professional opinion that the claimant's mental impairments posed moderate limitations on his ability to maintain concentration, persistence, or pace secondary to his reports of depression and his chronic pain. The undersigned gives great weight to this opinion and finds that the claimant's history of depression has resulted in moderate limitations on his ability to maintain concentration, persistence, or pace. The undersigned finds that these moderate limitations in his ability to sustain concentration, persistence, or pace would affect his ability to perform skilled or semi-skilled work activity on a sustained and full time basis. Therefore, the undersigned finds that the claimant could perform simple, routine, and repetitive work tasks. []
>
> For all of the foregoing reasons, the undersigned finds that from March 31, 2010 until November 9, 2015, the claimant retained the residual functional capacity to perform sedentary work as defined in 20 CFR 404.1567(a) and 416.967(a) except he could occasionally climb ramps/stairs, balance, crouch, and stoop; never kneel, crawl, climb ladders, or scaffolding; cannot tolerate any exposure to vibrations, unprotected heights, or dangerous moving machinery; can frequently reach, grasp, and finger with both arms; can understand, remember, and carry out simple, routine, and repetitive job instructions.

R. 534. Here, it is worth noting that the first paragraph refers to simple *tasks* whereas the second paragraph refers to simple *instructions.*

## ARGUMENT

Plaintiff's sole argument for remand relies on the *O'Connor-Spinner* line of cases in the Seventh Circuit. *See O'Connor-Spinner v. Astrue*, 627 F.3d 614 (7th Cir. 2010); *Yurt v. Colvin*, 758 F.3d 850 (7th Cir. 2014). These cases typically involve some variant on the following scenario. At Step Three, the ALJ finds, based on an acceptable medical source's opinion, that the

7

claimant has a moderate impairment in the category known as concentration, persistence, or pace. Then, in the later RFC analysis, the ALJ "translates" this more general and abstract finding into a more specific functional or job-related limitation for analysis by the vocational expert. This need for "translation" is partly a by-product of the five-step assembly line process required in disability cases, in which opinions from different types of experts are unified into a complex medical-legal judgment. At its worst moments, this process can feel like the Telephone Game when transmission slip-ups create minor wording differences that multiply into larger errors. Turning to the specific issue here, ALJs have struggled to find acceptable verbal formulations that would adequately translate an earlier finding of moderate concentration problems. In *O'Connor-Spinner*, the ALJ limited the claimant to "routine, repetitive tasks with simple instructions."[4] 627 F.3d at 618. But the Seventh Circuit held that, "[i]n most cases, [] employing terms like 'simple, repetitive tasks' on their own will not necessarily" address the individualized concentration problem that the particular claimant was suffering from. *Id.* at 620. The Seventh Circuit, in particular, focused on the following overlooked distinction that it found was not accounted for in the above formulations: "The ability to stick with a given task over a sustained period is not the same as the ability to learn how to do tasks of a given complexity." *Id.*

Plaintiff argues that the present case falls squarely within this rule, and even contains the additional wrinkle that the ALJ switched the word "instructions" for "tasks." Specifically, plaintiff argues that his ability to follow job instructions (an intellectual task) is better than his ability to do the same task repeatedly over a full work-day (persistence). This argument is consistent with plaintiff's testimony. In response, the Government argues that this case differs from some others in that Dr. Kravitz was the same person who both opined that plaintiff had

---

[4] Note that this formulation uses both the words "tasks" and "instructions," but does so in a slightly different version than the ones used by either Dr. Kravitz or the ALJ. In this Court's experience, there are a surprising number of variants created by using these same basic terms.

moderate problems in concentration and then who subsequently translated that finding into the proposed RFC. In other words, it was not the ALJ, as a layperson, who simply assumed that a limitation to simple tasks (or instructions) automatically would address the persistence problems. Instead, it was Dr. Kravitz's individualized analysis tailored to plaintiff's particular problem. In addition, the Government makes a broader argument criticizing the premise behind the *O'Connor-Spinner* cases. Although the Court has sympathy with the Government's arguments, the Court finds that a remand is still required because the ALJ could have, and should have, done more work to eliminate the ambiguities that we now must confront.

    Perhaps the best approach is to walk through the layers of decisionmaking and offer comments along the way. The first stop in this journey is Dr. Kravitz's testimony. Did he recognize the distinction noted in *O'Connor-Spinner*? The Court believes that he did. In the first sentence of the paragraph quoted above, Dr. Kravitz stated that he believed that plaintiff had moderate limitations in concentration, persistence, or pace. (As discussed below, it is unclear *why* he reached this conclusion, but he did.) Dr. Kravitz then, in the following sentences, found that plaintiff had the ability to follow *both* detailed *and* simple instructions, but that he had a separate persistence problem, one that could be accounted for by limiting him to "simple, repetitive tasks." The fact that the doctor made two separate findings supports the view that he understood the distinction. Moreover, the doctor's use of the word "so" makes clear that he included the limitation to "simple, repetitive tasks" specifically to address the latter problem of persistence and not to address any alleged intellectual deficiencies.

    This leads to principal legal question raised in the briefs. Was Dr. Kravitz permitted under the *O'Connor-Spinner* cases to account for plaintiff's particular persistence problem by limiting him to simple tasks (or instructions or some combination thereof)? Put differently, do

9

these cases set forth an absolute prohibition against this type of RFC limitation or do they merely set forth a default presumption? The Government argues that there is still a crack open in the door. Specifically, the Government makes the following argument about the differences between learning how to do a job versus actually doing it repeatedly:

> [T]he [Seventh] Circuit [] states that "the speed at which work can be learned is unrelated to whether a person with mental impairments—i.e., difficulties maintaining concentration, persistence, or pace—can perform such work." *Lanigan*, 865 F.3d at 565-66. That may be true—how long it takes to learn a job may be unrelated to whether someone with concentration, persistence, or pace problems can do the job. But whether work is simple, routine, and repetitive *is* actually related to whether a person with mental impairments—i.e., difficulties maintaining concentration, persistence, or pace—can perform such work. At a minimum, it is axiomatic that a job that is simple, routine, and repetitive requires less concentration than one that is complex, variable, and irregular. Importantly, unskilled work is not simply defined as work that can be learned in a certain period of time. Unskilled work is also, by definition, "work which needs *little or no judgment* to do *simple duties*." *See* 20 C.F.R. § 404.1568 (emphasis added). In short, the Seventh Circuit's criticism is illusory.

Dkt. #19 at 6-7.

Setting aside for a moment that this Court is bound by Seventh Circuit precedent, assessing this argument is tricky. On the one hand, there is some language from the Seventh Circuit cases to support the argument that, *in an individualized case*, limiting the claimant to simple tasks could be a way to address a persistence problem. As noted above, *O'Connor-Spinner* includes caveats such as "not necessarily" and "in most cases." *See also Walters v. Astrue*, 444 Fed. Appx. 913, 918 (7th Cir. 2011) ("*Usually*, those terms [*i.e.* routine, repetitive tasks with simple instructions] will not account for poor concentration.") (emphasis added). At the same time, some of the more recent cases state the rule in more absolute terms. *See, e.g., Yurt*, 758 F.3d at 858-59 ("we have repeatedly rejected the notion that a hypothetical like the one here confining the claimant to simple, routine tasks and limited interactions with others adequately captures temperamental deficiencies and limitations in concentration, persistence, and

10

pace"); *Warren v. Colvin*, 565 F3d. Appx. 540, 544 (7th Cir. 2014) ("We have cautioned that this exact language [*i.e.* simple, repetitive tasks] does not account for limitations on concentration[.]"). In sum, for the Government to prevail here, this uncertainty is one barrier.

Another obstacle is whether the ALJ's substitution of the word "instructions" for the word "tasks" changes the prior analysis. The parties go back and forth on this question. The Government, again relying mostly on basic logic and common sense, argues that a limitation to simple instructions necessarily means that the tasks themselves must also be simple. *See* Dkt. #19 at 5 ("Notably, plaintiff does not argue that a job with simple, routine and repetitive instructions can somehow complex tasks."). This appears to be a harmless error argument, characterizing the ALJ's change of wording as something akin to a scrivener's error. There is evidence to suggest that the ALJ's change in wording was inadvertent. As noted in the summary above, the decision itself uses the two different RFC formulations several paragraphs apart without acknowledging the difference. Also, plaintiff's counsel did not object when the ALJ, late in the hearing, switched the wording. However, the Government has not cited to any authority to support its argument. Another unclear issue is whether the vocational expert would have also agreed that the change from "tasks" to "instructions" made no difference in her assessment. Neither side provides a convincing analysis on this question either.

In sum, in light of all the above uncertainties, the Court finds that the prudent and more reasonable course is to remand this case so that these issues can be clarified and analyzed in greater detail. This is a disappointing result given all the time already expended on this case and given that the Government has made a colorable argument that the ALJ's decision should be affirmed. But ultimately, it was the ALJ who was in the best position to eliminate the ambiguities now preventing an affirmance. The ALJ was well aware of the need to be clear, specific, and

thorough in analyzing these issues. In addition to the case law, which contains numerous cases being remanded under similar facts, there was the also the remand order from the Appeals Council (instructing the ALJ to "clearly identify," "expressly explain," and be "specific"), as well as the various requests to address this issue made by plaintiff's counsel at the hearing.

Further support for the decision to remand can be found by looking at the mental health evidence from a broader perspective. One recurring frustration in analyzing *O'Conner-Spinner* arguments is that they tend to bypass the complex medical record and myopically focus on the precise meaning of short linguistic formulations. Lost in this process is the larger explanation—the logical bridge—about how all the mental health evidence fits together. Here, the Court finds that the ALJ, in general, did not provide a detailed analysis of plaintiff's mental health problems. Perhaps there was simply not much evidence to analyze. In any event, the Court makes two observations about the ALJ's analysis.

First, a linchpin of plaintiff's argument is the finding that he had moderate problems in concentration, persistence, or pace. But, throughout this long case, there has been little explanation for why this conclusion was warranted. Both the ALJ and Dr. Kravitz made statements suggesting that they generally viewed plaintiff's depression-related limitations as mild. For example, at the hearing, the ALJ noted that the "mental health evidence" was "not overwhelming." Dr. Kravitz stated that the "there's not very much in the medical record" about plaintiff's depression. Plaintiff testified that he never sought counseling at any time. The consultative examiner, Dr. Peter Thomas, in 2015 found that plaintiff's depression was "mild" and likely related to "lack of financial insecurity." R. 1183. One of the key pieces of evidence about plaintiff's persistence problem was his testimony at the 2013 hearing that he had trouble finishing a car magazine article, but the ALJ found that his testimony lacked credibility, a

finding plaintiff does not challenge here. In the 2013 decision, the ALJ noted that State Agency physicians were unable to even render an opinion because there was not enough evidence. Taken together, this evidence suggests that Dr. Kravitz and the ALJ may have simply given plaintiff the benefit of the doubt in finding that his concentration problems were moderate rather than mild.

Second, and pointing in the other direction, Dr. Woodman completed a mental impairment form in April 2013. On this form, he rendered several opinions strongly supporting plaintiff's claim that he was seriously limited by his depression.[5] Insofar as this Court can determine, the ALJ did not discuss Dr. Woodman's opinion in the 2016 decision. Although plaintiff in this appeal for some reason did not raise the argument, the Court finds that the ALJ should have addressed Dr. Woodman's opinion. It is from a treating source. Not only did the ALJ not discuss this opinion, one that strongly favored plaintiff's case, but he went further and found that no opinion even existed. R. 534 ("Dr. Woodman has never diagnosed or assessed any mental limitations."). The latter statement is contradicted by the 2013 opinion and also by the fact that Dr. Woodman had prescribed Wellbutrin for many years. On remand, the ALJ should address this issue, as well as all the other issues discussed herein.

## CONCLUSION

For the foregoing reasons, plaintiff's motion for summary judgment is granted, the government's motion is denied, and this case is remanded for further consideration.

Date: May 2, 2018        By: _____
                             Iain D. Johnston
                             United States Magistrate Judge

---

[5] These included the following: that plaintiff was seriously limited in maintaining attention for up to two hours, that he would miss more than four days a month, and that he could not perform at a consistent pace. R. 389.

13